IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

BURNHAM ENTERPRISES, LLC,   )
   )
          Plaintiff,   )
   )
      v.   )     CASE NO. 2:12-CV-111-WKW
   )          [WO]
DACC CO. LTD., *et al.,*   )
   )
          Defendants.   )

## MEMORANDUM OPINION AND ORDER

This case is before the court on two motions to compel arbitration and stay proceedings.  Defendant DACC Co., LTD., filed the first motion (Doc. # 34), and Defendants DACC-Aerospace Co. Ltd. and Honam Petrochemical Corporation filed the second (Doc. # 40).  For the reasons that follow, the motions are due to be granted.

## I.  JURISDICTION

Subject matter jurisdiction is exercised pursuant to 28 U.S.C. § 1332.  Personal jurisdiction is contested, but this opinion does not address that issue.

## II.  BACKGROUND

Carbon preform products are used in a number of civilian and military applications.  The Republic of South Korea, for instance, uses carbon preform disc brakes in its fighter jets – some of which were manufactured in Alabama by American

Structural Needling Company ("ASNC"), a division of Plaintiff Burnham Enterprises, LLC.

Before ASNC's brakes could reach South Korean fighter jets, they flowed in the stream of commerce through several intermediaries, including Defendant DACC Co., LTD. ("DACC").  DACC is a South Korean company that does business around the world.

The relationship between ASNC and DACC officially commenced in 2002 when they executed a long-term purchase agreement for the sale and purchase of preform material.[1]  Although that agreement contained a confidentiality clause, the parties also signed a separate confidentiality agreement shortly after executing the long-term agreement.  The long-term agreement contained an arbitration clause.  The confidentiality agreement did not.

After seven years of harmony, DACC began purchasing fewer and fewer products from ASNC.  Eventually, orders ceased altogether, ostensibly due to DACC's "business shrinkage."  (Doc. # 1 ¶ 34.)  The long-term agreement was never formally terminated.

---

[1]  A third company, Pointe International Inc., was also involved.  Pointe International is not a party to this action.

2

ASNC grew suspicious when DACC stopped placing orders and asked its attorney to investigate.  That investigation led ASNC to believe that DACC had misappropriated ASNC's trade secrets and proprietary information.  According to ASNC, DACC was using that information, along with Defendants Honam Petrochemical Corporation ("Honam") and DACC-Aerospace Co. Ltd. ("DACC-Aerospace"), to commercialize its own carbon preform products instead of continuing to purchase them from ASNC.

ASNC filed suit in this court against DACC, DACC-Aerospace, and Honam, claiming breach of contract, violations of trade secret law, fraud, interference with contractual and business relations, and conspiracy.  ASNC's complaint seeks at least $7.5 million in damages, along with declaratory and injunctive relief.  Defendants responded with four motions to dismiss (Docs. # 10, 20, 33, 39)[2] and two motions to compel arbitration (Docs. # 34, 40).  Only DACC filed an answer.  (Doc. # 35.)

## III.  STANDARD OF REVIEW

Pursuant to the Federal Arbitration Act ("FAA"), a written arbitration provision in a "contract evidencing a transaction involving commerce" is "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation

---

[2]  Because the motions to compel arbitration dispose of the matter at this juncture, this opinion will not address the arguments raised in the motions to dismiss, which include challenges to personal jurisdiction. *See Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574 (1999) (holding there is no mandatory sequencing of non-merits issues).

of any contract."  9 U.S.C. § 2.  The FAA evinces a "liberal federal policy favoring arbitration agreements."  *Hill v. Rent-A-Center, Inc.*, 398 F.3d 1286, 1288 (11th Cir. 2005) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983)); *see also Picard v. Credit Solutions, Inc.*, 564 F.3d 1249, 1253 (11th Cir. 2009) ("The FAA creates a strong federal policy in favor of arbitration.").  "[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration."  *Moses H. Cone*, 460 U.S. at 24-25.  Accordingly, the courts "rigorously enforce" arbitration agreements.  *Klay v. All Defendants*, 389 F.3d 1191, 1200 (11th Cir. 2004).  The FAA provides that "upon any issue referable to arbitration under an agreement in writing for such arbitration," and "upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement," the court "shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement."  9 U.S.C. § 3.

Further, the United States Supreme Court has consistently recognized "the emphatic policy" favoring arbitration applies with "special force in the field of international commerce."  *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 631 (1985).  This policy is based upon the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "New York

Convention"), which is incorporated and enforced through the provisions of the FAA

at 9 U.S.C. § 201 *et seq*.

## IV. DISCUSSION

Under the "very limited inquiry" contemplated by the New York Convention,

a district court must compel arbitration if four conditions are met:

(1)    there is an agreement in writing within the meaning of the Convention;

(2)    the agreement provides for arbitration in the territory of a signatory of the Convention;

(3)    the agreement arises out of a legal relationship, whether contractual or not, which is considered commercial; and

(4)    a party to the agreement is not an American citizen, or that the commercial relationship has some reasonable relation with one or more foreign states.

*Bautista v. Star Cruises*, 396 F.3d 1289, 1294 n.7 (11th Cir. 2005).

According to DACC, the arbitration clause in the long-term agreement meets

all four factors, so the court is obligated to compel arbitration.  ASNC disputes that

conclusion, arguing that the arbitration clause in the long-term agreement does not

apply to this dispute, which arises solely under the confidentiality agreement.  Further,

to the extent the long-term agreement's arbitration clause would otherwise apply,

ASNC argues the confidentiality agreement's dispute-resolution clause relieves it of

any obligation to arbitrate this dispute.

DACC-Aerospace and Honam argue that they are also entitled to invoke the long-term agreement's arbitration clause under the nonsignatory doctrine.  ASNC, however, urges that even if the arbitration agreement applies to DACC, it does not cover the claims against DACC-Aerospace and Honam, both non-signatories to the long-term agreement.

But as the following discussion will show, the terms of the two agreements, considered in light of the presumption favoring arbitration of international disputes, require ASNC to submit its dispute with DACC to arbitration.  Moreover, because ASNC's claims against DACC-Aerospace and Honam are intimately founded in and intertwined with the claims against ASNC, the nonsignatory doctrine requires arbitration of those disputes as well.

**A.**     **ASNC must arbitrate its claims against DACC.**

With regard to ASNC's claims against DACC, the only real dispute involves a simple question of contractual interpretation:  Did the parties agree to submit this dispute to arbitration?  If they did, a second question arises:  Did the parties revoke or modify their agreement to arbitrate?

### 1. DACC and ASNC agreed to arbitrate this dispute.

As with any question of contractual interpretation, the first place to look is the language of the contract itself.  The relevant portion of the arbitration clause in the long-term agreement between ASNC and DACC reads as follows:

> Buyer and Seller/Supplier agree that any controversy or claim arising out of or in connection with this contract, or its interpretation, shall be settled by arbitration in Seoul, the Republic of Korea . . . .

(Doc. # 34-1, at 15.)  Under the plain meaning of that clause, ASNC must submit to arbitration its claims against DACC if they arise out of or are in connection with the long-term purchase agreement.

The most compelling argument to that effect comes from ASNC's own characterization of the facts:  According to the complaint, DACC told ASNC that "DACC would not be able to purchase ASNC's product without first having the carbon preform material and engineering specifications; . . . without providing ASNC's proprietary information and specifications to the South Korean government, DACC would not be able to purchase carbon preforms from ASNC."  (Doc. # 1 ¶ 14.)  ASNC goes on to claim that those representations were false when they were made, but those allegations nonetheless show that ASNC entered into the purchasing agreement with the understanding that exchange of proprietary information was part of the arrangement.

Now ASNC argues this lawsuit is "based solely on – and arise[s] only from – the confidentiality agreement" it executed with DACC shortly after the long-term agreement.  To that end, ASNC urges that "[b]ut for the Confidentiality Agreement, ASNC would not have shared its information and trade secrets with DACC."  (Doc. # 42, at 4.)  That may be true, but the complaint indicates that but for ASNC's promise to share proprietary information, DACC would not have entered into the long-term agreement.  Logically, then, the very existence of the confidentiality agreement was necessitated by the long-term agreement.  Only by ignoring the chain of events alleged in the complaint could one consider this case as a dispute related exclusively to the confidentiality agreement.

Other provisions of the long-term agreement show that the claims ASNC now asserts against DACC fall comfortably within the category of claims "arising out of or in connection with" that agreement.  For instance, the quality assurance provision of the long-term agreement specifically gives DACC the right to "inspect and audit those areas of [ASNC's] facilities where manufacturing actives [sic] are in process, [along with] technical documentation control and relevant records."  (Doc. # 34-1, at 11.)  Another provision gives DACC "access to any and all areas that are related to the purchasing items, including those subcontracted, where work is being done or scheduled to be performed" under the long-term agreement.  (Doc. # 34-1, at 11.)  The

long-term agreement also expressly provides for the exchange of engineering data and test reports (Doc. # 34-1, at 9–10, 13), and contemplates the exchange of confidential proprietary information (Doc. # 34-1, at 6). Finally, the confidentiality clause of the long-term agreement illustrates the parties' acknowledgment that their relationship would involve sharing "proprietary or confidential information." (Doc. # 34-1, at 7.)

At any rate, ASNC's arguments focus on the idea that this lawsuit does not arise out of the long-term purchasing agreement. But ASNC has not attempted to argue this lawsuit does not qualify as a "controversy or claim . . . in connection with" the long-term agreement. However far one stretches ASNC's reasoning, its arguments do not lead one to conclude this controversy is unconnected with the long-term agreement. As the Eleventh Circuit has noted, "[w]hether a claim falls within the scope of an arbitration agreement turns on the factual allegations in the complaint rather than the legal causes of action asserted." *Gregory v. Electro-Mechanical Corp.,* 83 F.3d 382, 384 (11th Cir. 1996). The factual allegations in ASNC's complaint are rife with references to the long-term agreement; any attempt now to deny this case's connection with that agreement is not credible.

Finally, two policy considerations eliminate any lingering doubts that might favor denying DACC's motion to compel arbitration: First, there is an emphatic presumption favoring arbitration, which applies with special force in the international

context.  *See Moses H. Cone*, 460 U.S. at 24-25.  That presumption requires the court to resolve any questions concerning the scope of arbitrable issues in favor of arbitration "unless . . . it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute."  *AT&T Tech. Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 651 (1986).  Therefore, the court cannot deny DACC's motion to compel arbitration if any interpretation of the long-term agreement's arbitration clause covers this dispute.  Because the court cannot conclude with "positive assurance" the long-term agreement's arbitration clause does not cover this dispute, the law requires an interpretation favoring arbitration.

Second, the agreement expressly provides that questions of its own interpretation "shall be settled by arbitration . . . in accordance with the rules of Conciliation and Arbitration of the International Chamber of Commerce." (Doc. # 34-1, at 11.)  According to those rules, "any decision as to the jurisdiction of the arbitral tribunal . . . shall then be taken by the arbitral tribunal itself."  (Doc. # 47, at 15 (quoting International Chamber of Commerce, Rules of Arbitration, Article 6(5) (Jan. 1, 2012), *available at* http://www.iccwbo.org/products-and-services/arbitration-and-adr/arbitration/icc-rules-of-arbitration/).    When there is clear and unmistakeable evidence that the parties to a contract agreed to arbitrate not only their underlying dispute, but also preliminary questions of arbitrability, courts must respect

that agreement. *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995). Here the language of the arbitration agreement, coupled with the rules it adopts by reference, provide clear and unmistakable evidence that ASNC and DACC agreed to have questions of arbitrability settled in arbitration, not in court. *See, e.g., Terminix Int'l Co. v. Palmer Ranch Ltd. P'ship*, 432 F.3d 1327, 1332-33 (11th Cir. 2005) (finding clear and unmistakable evidence that parties agreed to arbitrate questions of arbitrability based on rules incorporated by reference to the contract). Because of that agreement, it is for the arbitrator to decide whether ASNC's dispute with DACC falls within the scope of the long-term agreement's arbitration clause.

### 2. *DACC and ASNC did not revoke their arbitration agreement.*

The long-term agreement is not, however, the only contract at issue here. ASNC's claims also implicate the confidentiality agreement it executed with DACC. The confidentiality agreement contains its own dispute-resolution clause – one that makes no mention of arbitration. According to ASNC, that provision served to modify and delete any agreement to arbitrate this dispute found in the long-term agreement.

As ASNC points out, the confidentiality agreement does mention litigation as a possibility in the event a dispute arises. But before either party resorts to litigation to solve any dispute under that agreement, it is required to schedule a mandatory

meeting and make a good-faith attempt to resolve the dispute.  If the meeting is a failure, then "each party obtains applicable remedies under law or equity." (Doc. # 34-2, at 4.)  Basically, then, the confidentiality agreement sets the mandatory meeting as a necessary condition that must be satisfied before either party can litigate.

That agreement does not, however, establish the mandatory meeting as a *sufficient* condition that triggers a right to litigate.  Rather, it provides only that failure to settle a dispute at the mandatory meeting entitles the parties to "*applicable* remedies under law or equity." (Doc. # 34-2.)  In other words, after the mandatory meeting, the parties may pursue whatever remedies are available to them.  Because of the arbitration clause in the long-term agreement, though, litigation is not an applicable remedy.  ASNC and DACC agreed in advance they would not settle this dispute in court, so arbitration is the only applicable remedy under the confidentiality agreement.

ASNC insists, however, that the confidentiality agreement modified and deleted any agreement to arbitrate found in the long-term agreement. (Doc. # 45, at 6–7.)  As support for that conclusion, ASNC cites cases that show "parties are free to modify agreements, and if the terms of a subsequent agreement contradict the earlier agreement, the terms of the later agreement prevail." *See Cavalier Mfg., Inc. v. Clarke*, 862 So. 2d 634, 641 (Ala. 2003).  That principle is not in dispute.  As it happens, the long-term agreement specifically allows for its own modification, so long

as the modification is made in the form of a signed writing.  (Doc. # 34-1, at 11.)  But even though ASNC's premises are sound, its conclusion is flawed – the confidentiality agreement neither expressly modifies the long-term agreement nor supersedes the arbitration clause through inconsistency.

A review of the confidentiality agreement reveals no evidence that the parties intended to expressly modify the long-term agreement's arbitration clause.  Indeed, that agreement makes no reference to the long-term agreement whatsoever.  And as ASNC candidly admits, "[n]owhere does the Confidentiality Agreement mention arbitration."  (Doc. # 42, at 5.)

Nor does the confidentiality agreement's dispute-resolution clause supersede the long-term agreement's arbitration clause through inconsistency.  Although both agreements address aspects of dispute resolution, neither clearly conflicts with the other.  It is true that the confidentiality agreement does mention litigation, but it does so only to set a procedure the parties must follow "*before* [they] resort to litigation." (Doc. # 34-2, at 4 (emphasis added).)   As to what follows, the confidentiality agreement only says the parties "obtain applicable remedies under law or equity" (Doc. # 34-2, at 4), not that the parties have a guaranteed right to litigate their dispute in court.  In other words, the confidentiality agreement does not clearly show an agreement that litigation *is* an option; it only specifies that litigation *is not* an option

before the mandatory meeting is held.  The long-term agreement, on the other hand, affirmatively provides that the parties agreed to settle this dispute through arbitration, not litigation.  Because the confidentiality agreement does not clearly provide that the parties have the right to litigate their dispute on the merits, it does not supersede the long-term agreement's arbitration clause.

That is not to say that the parties completely disclaimed their right to relief in this court.  The confidentiality agreement expressly provides that, "either party may seek injunctive relief in any court of competent jurisdiction against improper use or disclosure of proprietary information."  (Doc. # 34-2, at 4.)  That provision is fully consistent with the interim relief specifically allowed by the International Chamber of Commerce's Rules of Arbitration, which are incorporated into the long-term agreement's arbitration clause.  *See* International Chamber of Commerce, Rules of Arbitration, Article 28 (January 1, 2012) ("Before the file is transmitted to the arbitral tribunal, and in appropriate circumstances even thereafter, the parties may apply to any competent judicial authority for interim or conservatory measures.").  Accordingly, although ASNC must submit the merits of its dispute with DACC to arbitration, it may nonetheless apply to this court for appropriate injunctive relief pending the arbitrator's decision on the merits.  *See Am. Express Fin. Advisors, Inc. v. Makarewicz*, 122 F.3d 936, 940 (11th Cir. 1997) (recognizing availability of

injunctive relief when arbitration agreement specifically provided for such relief in court of competent jurisdiction).

**B.**   **ASNC must arbitrate its claims against DACC-Aerospace and Honam**

According to the nonsignatory doctrine, a party may invoke an arbitration agreement he did not sign "if the relevant state contract law allows him to enforce the agreement." *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 632 (2009).  Honam and DACC-Aerospace rely on that doctrine, coupled with the state-law doctrine of equitable estoppel, to argue they are entitled to arbitration on the claims against them.

Under Alabama law, equitable estoppel allows a nonsignatory to compel arbitration if (1) the claims against the nonsignatory are "intimately founded in and intertwined with the claims made by the party resisting arbitration against an entity that is a party to the contract," and (2) the arbitration agreement itself does not preclude arbitration by the party seeking it.  *Ex parte Stamey*, 776 So. 2d 85, 89 (Ala. 2000) (quotations omitted).  ASNC does not dispute that the second requirement is met, so the only question is whether ASNC's claims against DACC-Aerospace and Honam are "intimately founded in and intertwined with" with its claims against DACC.

Three counts of the complaint easily meet that standard:  Counts II (violations of trade secret law), V (conspiracy), and VI (declaratory and injunctive relief) name

all three Defendants and allege the same wrongful conduct.  In those counts, the claims against DACC are not only "intimately founded in and intertwined with" those against DACC-Aerospace and Honam; they are, in essence, identical.  *See Kenworth of Mobile, Inc. v. Dolphin Line, Inc.*, 988 So. 2d 534, 543 (Ala. 2008) (finding claims were intimately founded in and intertwined with one another when they arose from the same set of facts and made no distinction between any of the defendants). ASNC's brief notes that the Alabama cases on point "show a pattern of relationships between the signatories and non-signatories such that the claims asserted against the non-signatories are essentially the same claims asserted against the signatory." (Doc. # 45, at 12.)  ASNC has not, however, explained why Counts II, V, and VI of the complaint do not meet that standard when they bring identical claims against DACC-Aerospace and Honam (the non-signatories) as DACC (the signatory).

Further, Count IV – the only other count naming DACC-Aerospace or Honam – alleges intentional interference with "among other things, ASNC's *contractual and business relations*, including its Confidentiality Agreement and *purchasing relationship* with DACC." (Doc. # 1 ¶ 71 (emphasis added).)  ASNC somehow argues that its claims "are not based on, or related to, DACC's performance under the [long-term agreement]." (Doc. # 45, at 12.)  ASNC does not explain, however, how a claim alleging intentional interference with a contractual and business relationship is

anything but intimately founded in and intertwined with the underlying contractual and business relationship. ASNC has cited no authority to support such a conclusion, and the court is aware of none. Accordingly, ASNC's claim for intentional interference, like its other claims against DACC-aerospace and Honam, is intimately founded in and intertwined with its claims against DACC.

ASNC urges a contrary result by attempting to recast the doctrine of intertwining as an inquiry that focuses on the relationship between parties, not claims. According to ASNC, "[e]quitable estoppel is based upon the premise that the non-signatories were present and somehow involved in the transaction between the signatories to the contract and believed that they were covered by the arbitration clause." True, that argument finds some support in a phrase from *Ex parte Stamey* that summarized the legal standard by saying equitable estoppel applies when an arbitration agreement is so broad "the nonsignatory believed he had the right to have the claims against him submitted to arbitration, and, therefore, that he saw no need to enter into a second arbitration agreement." 776 So. 2d at 89. Whatever the import of that language, it has never been cited to deny a finding of equitable estoppel when the two-part test from *Ex parte Stamey* was satisfied. Because both parts of that test are met, ASNC is estopped from bringing its claims against DACC-Aero and Honam in this litigation. Those claims are subject to arbitration.

17

## V.  CONCLUSION

Accordingly, it is ORDERED that

(1)   Defendants' motions to compel arbitration and stay proceedings (Docs. # 34, 40) are GRANTED, and Plaintiff is ORDERED to submit this dispute to arbitration in the manner provided for in the arbitration clause.

(2)   This action is STAYED pending arbitration.  Plaintiff shall file a jointly prepared report regarding the status of arbitration proceedings on or before **March 1, 2013**, and every ninety (90) days thereafter, until this matter is resolved.

(3)   All other pending motions (Docs. # 10, 20, 33, 39) are DENIED as moot, without prejudice.  The parties may renew any motions that remain relevant after the stay is lifted.

DONE this 7th day of January, 2013.

_____/s/ W. Keith Watkins_____
CHIEF UNITED STATES DISTRICT JUDGE